## UNITED STATES COURT OF INTERNATIONAL TRADE

AMSTED RAIL COMPANY, INC. and
ASF-K DE MEXICO S. DE R.L. DE C.V.,

        Plaintiffs,

   v.

U.S. DEPARTMENT OF COMMERCE and
U.S. SECRETARY OF COMMERCE GINA
M. RAIMONDO, in her official capacity,

        Defendants,

Case No. 22-cv-00316

**PUBLIC VERSION**

## VERIFIED COMPLAINT OR, IN THE
## ALTERNATIVE, PETITION FOR WRIT OF MANDAMUS

Plaintiffs Amsted Rail Company, Inc. ("ARC") and ASF-K de Mexico S. de R.L. de C.V.

("ASF-K") ("Plaintiffs"), by and through their respective attorneys, bring this action against

defendants, the U.S. Department of Commerce ("Department") and its Secretary, Gina M.

Raimondo, for injunctive and declaratory relief:

    (i)    Directing the Department to disqualify the law firm of ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ ("Firm") from further participation in an
ongoing set of antidumping and countervailing duty investigations, *Certain
Freight Rail Couplers and Parts Thereof from China and Mexico*, DOC Inv.
Nos. A-570-145, A-201-857, C-570-146 ("Current Investigations");

    (ii)    Directing the Department to rescind the Firm's authorization to receive
Plaintiffs' business proprietary information ("BPI") submitted under the
Administrative Protective Order ("APO") in the Current Investigations; and

    (iii)    Directing the Department to terminate the Current Investigations under the
Department's sanctions authority and/or dismiss the underlying
antidumping and countervailing duty petitions.

Plaintiffs allege and state as follows:

## I.   Jurisdiction

1.      This Court has subject-matter jurisdiction over this matter under 28 U.S.C. §§ 1581(i)(1) and 1585. *See Makita Corp. v. United States*, 17 C.I.T. 240, 245 & n.6, 819 F.Supp. 1099, 1103-04 & n.6 (1993) (under § 1581(i), "[t]his is a forum which has jurisdiction over" matters "regarding actual or potential breaches of conflict of interest" in antidumping and countervailing duty investigations); *SNR Roulements v. United States*, 13 C.I.T. 1, 4, 704 F. Supp. 1103, 1107 (1989) (where Department "allows the release of confidential information under a protective order . . . this Court's jurisdiction to review that action is based on 28 U.S.C. § 1581(i)"); *Hyundai Pipe Co. v. U.S. Dep't of Commerce*, 11 C.I.T. 238, 240, 242 (1987) (although "Commerce has the responsibility to police its protective orders . . . [n]evertheless, this court has jurisdiction" pursuant to 28 U.S.C. § 1581(i) to forbid BPI release).

2.      In addition, this Court "has plenary authority and responsibility to supervise professional conduct" over any attorney who is "a member of the Bar of this Court of International Trade." *Makita*, 17 C.I.T. at 245; *see also Retamal v. U.S. Customs & Border Protection*, 439 F.3d 1372, 1376 (Fed. Cir. 2006) (although the Court of International Trade "lacked jurisdiction over the merits" of a case, under "its inherent power," it nonetheless "has the authority to discipline attorneys appearing before it"). This is because "regulation of attorney behavior is an inherent power of any court of law." *In re Bailey*, 182 F.3d 860, 864 (Fed. Cir. 1999).

3.      In the alternative, the Court can and, if need be, should treat this Verified Complaint as a petition for writ of mandamus under 28 U.S.C. §§ 1361, 1585, 1651, and 2643. Under the latter statute, with certain exceptions inapplicable here, the Court of International Trade may "order any other form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. § 2643(c)(1).

## II.       Timeliness Of The Action

4.       An action under 28 U.S.C. § 1581(i) must be commenced within two years after the cause of action first accrues. 28 U.S.C. § 2636(i).

5.       As it concerns the ethical violation alleged herein, as described in further detail below, the cause of action in this matter accrued on September 28, 2022, when the petition in the Current Investigations was filed.

6.       As it concerns BPI access, as described in further detail below, the cause of action in this matter accrued on October 18, 2022, when the Department informed Plaintiffs, via a letter from Erin Bagnal, Director of AD/CVD Operations (Enforcement and Compliance), that the Department would not make a determination as to whether the Firm should be disqualified from further participation in the Current Investigations.

7.       In the same letter, the Department also informed Plaintiffs that it would not (a) timely rescind access to Plaintiffs' BPI in the Current Investigations for attorneys that have breached their ethical obligations and violated the APO issued in *Certain Freight Rail Coupler Systems and Components from China*, DOC Inv. Nos. A-570-143, C-570-144 ("Predecessor Investigations"); or (b) timely terminate the Current Investigations under the Department's sanctions authority and/or dismiss the underlying antidumping and countervailing duty petitions.

### III.    Parties

8.    Plaintiff ARC is a U.S. producer of freight rail coupler systems and components thereof ("FRCs"), which include E, F, and E/F couplers and E and F knuckles. ARC is also a U.S. importer of FRCs subject to the Current Investigations. Plaintiff ARC imports and sells the subject merchandise produced by ASF-K and therefore would be liable for any resulting antidumping duties assessed on its imports.

9.    Plaintiff ASF-K is ARC's affiliated *maquiladora* that produces freight rail couples and knuckles in Mexico  subject to the Current Investigations. On information and belief, ASF-K is the only producer of FRCs in Mexico.

10.    Defendant U.S. Department of Commerce is conducting the Current Investigations and is responsible for fulfilling a range of trade-related mandates.

11.    Defendant Gina M. Raimondo, sued in her official capacity, is the Secretary of the U.S. Department of Commerce.

### IV.    Standing

12.    Plaintiffs have standing to sue because they are "adversely affected or aggrieved by agency action within the meaning of" the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq. See* 5 U.S.C. § 702; 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of Section 702 of title 5."); 28 U.S.C. § 2640(d) ("In any civil action not specified in this section, the Court of International Trade shall review the matter as provided in section 706 of title 5.").

13.     As discussed further below, the Firm's continued participation in the Current Investigation under a disabling conflict of interest adversely affects and aggrieves Plaintiffs, who should not be subject to trade investigations tainted by the Firm's ethical violations.

14.     In addition, the Department's decisions regarding the Firm's access to Plaintiffs' BPI—despite the fact that counsel for the petitioner in the Current Investigations breached their ethical obligations and may have violated an APO in the substantially related Predecessor Investigations—adversely affects and aggrieves Plaintiffs because of the continuing risk that those attorneys may misuse or reveal sensitive BPI of the Plaintiffs.

## V.     Facts Common To All Claims For Relief

### The Predecessor Investigations

15.     On June 17, 2021, ARC engaged the law firm of Wiley Rein LLP ("Wiley") "to provide legal services in connection with advice regarding the elevation and potential prosecution of antidumping of imports of certain couplings and related rail products."

16.     ARC and Wiley formalized this engagement in a letter expressly naming ARC as the client.

17.     A Wiley partner, ▮▮▮▮▮▮▮▮▮ ("Attorney"), executed the engagement letter on the firm's behalf. On information and belief, the Attorney is a member of the Bar of this Court, as well as being a member of the Bar of the District of Columbia.

18.     The engagement letter elaborated on the representation's "purpose":

> The purpose of this representation is to evaluate and pursue as appropriate a trade remedy investigation, specifically including any antidumping and/or countervailing duty proceeding filed on behalf of the domestic manufacturing industry, including any petition filed with the U.S. Department of Commerce and the U.S. International Trade Commission, and any subsequent litigation, as well as other litigation and lobbying services related to this investigation.

19.     The engagement letter contained an advance waiver of potential future conflicts. By its terms, the advance waiver extends only to Wiley itself—not the Attorney or others. The advance waiver also expressly excludes "matters that are substantially related to our work for you":

> As a large firm with a diverse practice, we represent many other companies and individuals. It is possible that during the time that we are representing you, some of our present or future clients will have disputes or transactions with you, or undertake activities that may, directly or indirectly, conflict with your activities and interests. For example, we may represent other participants in your industry and competing industries—as well as their suppliers, customers, and trade associations. Moreover, we maintain a multidisciplinary practice that includes, but is not limited to, the following practice areas: Appellate, Consumer Product Regulation, Corporate, Election Law & Government Ethics, Employment & Labor, Environment & Safety, Food Drug & Medical Device Law, Franchise, FTC Regulation, Government Contracts, Health Care, Insurance, Intellectual Property, International Trade, Litigation, Privacy & Cybersecurity, Public Policy, Telecom, Media & Technology (TMT), and White Collar Defense & Government Investigations, all of which are described on our firm's website. Notwithstanding our firm's representation of clients across a broad range of practice areas, you agree, except as to matters that are substantially related to our work for you, that we may continue to represent or may undertake in the future to represent existing or new clients in any matter, including litigation, even if the interests of such clients in those other matters are directly adverse to your own. For our part, upon becoming aware of the need, the firm agrees to take reasonable steps to establish and maintain an ethical "screen" designed to provide assurance that firm attorneys who have worked for you or continue to work for you will not, inadvertently or otherwise, share confidential information provided by you with others.

> In a trade remedy investigation, we typical [sic] represent several members of the domestic industry that may have interests adverse to other members of any petitioning coalition with respect to future trade or commercial matters. As a result, the domestic producers could be adverse to each other in an antidumping investigation, trade investigation, or other matter. You agree that nothing contained in this representation, including the sharing of information and documents, shall be the basis of a claim of conflict of interest or disqualification against Wiley Rein. Specifically, you agree to waive all current or future conflicts with Wiley Rein with respect to

> antidumping, countervailing duty, or other trade investigations and
> will not seek disqualification of Wiley Rein in regard to, or on the
> basis of, any antidumping, countervailing duty, or other trade
> remedy investigation.

20.    Through the Attorney, on September 29, 2021, the Coalition filed its petition with the Department and the U.S. International Trade Commission ("Commission"), commencing the Predecessor Investigations.

21.    At the time, the Coalition was composed of two constituent members: ARC and M&T, a domestic producer of FRCs.

22.    The petition principally alleged that certain FRCs imported from China were being subsidized by the Government of China within the meaning of section 701 of the Tariff Act of 1930, *codified as amended at* 19 U.S.C. § 1671 ("Tariff Act"), and were being or were likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act, *codified as amended at* 19 U.S.C. § 1673, and these unfairly traded imports materially injured the domestic industry producing FRCs.

23.    The period of investigation at the Department for the antidumping investigation was January 1, 2021 through June 30, 2021. *Freight Rail Coupler Systems and Certain Components Thereof From the People's Republic of China*, 87 Fed. Reg. 14,511, 14,511 (Mar. 15, 2021) (preliminary antidumping determination). For the countervailing duty investigation, the period of investigation was January 1, 2020, through December 31, 2020. *Freight Rail Coupler Systems and Components Thereof from the People's Republic of China*, 87 Fed. Reg. 12,662, 12,662 (Mar. 7, 2022) (preliminary countervailing duty determination). The period of investigation at the Commission was 2019 through 2021, with the record remaining open until June 8, 2022. *Freight Rail Coupler Systems and Components from China*, USITC Inv. Nos. 701-TA-670 & 731-TA-1570 (Final), USITC Pub. 5331 (July 2022), at 3.

24.     On October 6, 2021, ARC, again through the Attorney, filed a letter in the Predecessor Investigations withdrawing from the petition. The letter explained that ARC would no longer participate as a petitioning party and the USW would replace ARC as a member of the Coalition.

25.     On October 14, 2021, ARC's current counsel, the law firm of Faegre Drinker Biddle & Reath LLP ("Faegre"), entered an appearance in the Predecessor Investigations.

26.     Until its withdrawal, ARC supervised and materially contributed to the Attorney's preparation for the Predecessor Investigations.

27.     ARC confided in the Attorney its legal strategy for prosecuting FRC-related trade investigations, competitive decision-making processes, and extensive FRC-related BPI relevant to establishing the scope of domestic like product, the domestic industry, and the conditions of competition.

28.     ARC disclosed this confidential information, including via telephone calls, in the reasonable expectation and belief that the Attorney would preserve it within the confines of the attorney-client relationship.

29.     The Attorney's emails to ARC described themselves as "Attorney Client Communication – Privileged & Confidential," or variants of that description.

30.     Even after Faegre entered its appearance for ARC, the Attorney attempted to coach ARC into taking positions he would later use against ARC in the Current Investigations. For instance, in March 2022, the Attorney told ARC it would be "very helpful" if ARC took the position, "to the extent that it is factually correct," that "a significant part of the decision to move production to Mexico was due to competition with low priced imports from China."

31.     For Wiley's legal services, ARC paid substantial attorneys' fees and costs. On information and belief, it shared these expenses equally with M&T.

32.     The Department issued an APO in the Predecessor Investigations on October 12, 2021 ("Predecessor APO").

33.     On March 8, 2022, the Attorney entered his appearance on the Coalition's behalf to reflect that he had changed law firms. Also on March 8, 2022, Wiley amended its APO application to remove the Attorney from Wiley's APO.

34.     ████████—a certified public accountant ("Accountant")—accompanied the Attorney in his move from Wiley to the Firm. As reflected on the petition's cover page, the Accountant was one of the Coalition's representatives in the Predecessor Investigations.

35.     The Commission scheduled the final phase of the Predecessor Investigations following notification of preliminary determinations by the Department that imports of FRCs from China were subsidized within the meaning of section 703(b) of the Tariff Act, 19 U.S.C. § 1671b(b), and sold at less than fair value within the meaning of 733(b) of the Tariff Act, 19 U.S.C. § 1673b(b). Notice was given of the scheduling of the final phase and of a public hearing to be held.

36.     The Commission conducted its hearing on May 12, 2022. Representatives for the Coalition appeared at the hearing accompanied by counsel and submitted pre-hearing and post-hearing briefs, and final comments. Three respondent entities—Strato, Inc., Wabtec Corp., and TTX Company—participated in the final phase.

37.     The Commission announced its unanimous negative vote on June 14, 2022, thus terminating the Predecessor Investigations and denying the Coalition its requested relief.

38.     In early July 2022, the Commission issued its determinations and released its final report.

39.     Based on the record in the Predecessor Investigations' final phase, the Commission determined that an industry in the United States was not materially injured or threatened with material injury by reason of FRC imports found by the Department to be sold in the United States at less than fair value and to be subsidized by the Government of China.

40.     One reason for the negative injury determination was that Chinese FRCs could not be considered a cause of the alleged injury because of significant non-subject FRC imports from Mexico.

41.     Until July 2022, the Predecessor APO covered only the Attorney and two non-attorneys, one of whom was the Accountant.

42.     On July 15, 2022, however, nearly two months after the Department issued its final determinations—effectively concluding the Department's phase of the Predecessor Investigations—the Firm filed an amendment to the Predecessor APO adding seven attorney applicants and two non-attorney applicants.

43.     More than two months later, on September 23, 2022, the Firm certified its destruction of Predecessor APO-covered materials.

### The Current Investigations

44.     Just days after certifying destruction of the confidential record from the Predecessor Investigations, on September 28, 2022, the Coalition filed a second petition commencing the Current Investigations. The Current Investigations are a reprise of the Predecessor Investigations. Both sets of investigations were and are quasi-adjudicative antidumping and countervailing duty investigations before the Commission and the Department pursuant to the same body of statutory

and regulatory provisions. The petitioning party in each investigation was the Coalition, of which ARC is a former member. The FRCs covered by the investigations include E, F, and E/F couplers and E and F knuckles. ARC's BPI concerning its FRCs was used in the Predecessor Investigations; much of that same BPI will be the focus of the Current Investigations. The petitions in both commonly allege that FRCs are being or are likely to be sold at less than normal value within the meaning of section 731 of the Tariff Act. In the Predecessor Investigations, the period of investigation ("POI") in the Department's antidumping investigation of FRCs from China was January 1, 2020, through June 30, 2020. In the Current Investigations, the POI in the Mexico antidumping investigation is July 1, 2021, through June 30, 2020; the POI in the China antidumping investigation is January 1, 2022, through June 30, 2022; and the POI in the China countervailing duty investigation is January 1, 2021, through December 31, 2021.

45.     On September 29, 2022, the Firm filed with the Department an APO application in the Current Investigations ("Current APO") covering the same set of Firm lawyers and staff covered under the Predecessor APO.

46.     Today, the Coalition's two members are M&T and USW.

47.     M&T is ARC's industry competitor.

48.     The USW represents unionized workers at ARC.

49.     The Coalition contends that the USW became a member "because of the impact of subject imports on USW workers," including purported job losses "in the domestic FRC industry."

50.     In the Current Investigations, the Coalition hopes to "fix" the negative injury determination in the Predecessor Investigations by adding imports from Mexico to the Current Investigations' scope.

51.     To do this, the Coalition paints a target on ARC. As asserted in the Coalition's petition, ARC "was formerly a major producer of FRCs in the United States, relocated substantially all of its FRC production to Mexico and is now an importer of in-scope FRCs that are produced at its Mexican location." The Coalition further asserts that "[t]he AAR certified manufacturing plant in Mexico that manufactures FRC products is ASF-K de Mexico, S. de R. L. de C.V. Sahagun, which is owned by ASF-Keystone, a division of Amsted Industries' Amsted Rail Group." This is the same scenario that existed during the Predecessor Investigations, yet the Coalition, represented by the Attorney, did not include Mexican imports there.

52.     In the new petition's telling, the "shift to production in Mexico by [ARC] has resulted in a significant market share decrease for domestic producers that chose not to abandon their U.S. employees and to continue their FRC production in the United States."

53.     ARC "relocated its production to Mexico," the Coalition posits in its petition, "to offer prices in the U.S. market for its imported FRCs from Mexico that are competitive with Chinese FRCs."

54.     Immediately upon learning of the Attorney's participation in the Current Investigations as the Coalition's lead counsel, ARC moved to protect itself from the Attorney's betrayal. It directed Faegre to send a letter to the Attorney detailing his ethical violation and requesting the Firm's withdrawal from further representation of the Coalition in the Current Investigations. Faegre sent a letter to that effect on October 6, 2022.

55.     The Firm's general counsel responded by letter on October 11, 2022. Ignoring that ARC is the importer of record and would be harmed by the trade relief requested in the Current Investigations, the Firm asserted that ARC actually "stands to benefit" if the Current Investigations succeed. The Firm further asserted that Wiley negotiated a "robust advance waiver" in the June

2021 engagement letter. The advance waiver applies only to Wiley itself and, further, excludes "matters that are substantially related to our work for you."

56.     On October 12, 2022, ARC filed a letter with the Department asking it to: (i) disqualify the Firm from further participation as counsel for the Coalition in the Current Investigations; (ii) rescind the Firm's authorization to receive BPI under the Current APO; and (iii) terminate the Current Investigations under the Department's sanctions authority and/or dismiss the underlying antidumping and countervailing duty petitions as the Department cannot reasonably determine the accuracy and adequacy of the evidence provided in the petition.

57.     One basis for these requests was the Attorney's violation of Rule 1.9(a) of the American Bar Association's ("ABA") Model Rules of Professional Conduct and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. Rule 1.9(a) provides: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

58.     The Department has the power to disqualify lawyers from practicing in specific trade investigations provided that "good cause" is shown. The Department's rules state in relevant part: "Any attorney or representative practicing before the Department, or desiring so to practice, may for good cause shown be suspended or barred from practicing before the Department, or have imposed on him such lesser sanctions (e.g., public or private reprimand) as the Secretary deems appropriate, but only after he has been accorded an opportunity to present his views in the matter." 19 CFR § 351.313(a).

59.   The term "good cause" is not defined in this rule or in the rule's enabling legislation. However, the Department has applied the ABA Model Rules, including Rule 1.9(a), to evaluate whether a lawyer or law firm should be disqualified from practicing in antidumping and countervailing duty investigations. *See, e.g.*, Memo. from Enforcement & Compliance, Office, U.S. Department of Commerce, *Silicon Metal from the Republic of Kazakhstan: Representation of Tau-Ken Temir LLP by Squire Patton Boggs*, C-834-811 (Oct. 6, 2020).

60.   Another basis for the requests was the Firm's potential violation of the Predecessor APO. The Department's APO-related regulations provide that "actions that constitute violations of an administrative protective order" include "[u]se of business proprietary information submitted in one segment of a proceeding . . . in another proceeding, except as authorized by the Tariff Act of 1930 or by an administrative protective order." 19 C.F.R. § 354.5(d)(7). APO-covered BPI may sometimes be used for purposes of different segments of the same proceeding, but not for purposes of an entirely different proceeding. *See id.* § 351.306(b) ("An authorized applicant may use business proprietary information for purposes of the segment of a proceeding in which the information was submitted. If business proprietary information that was submitted in a segment of the proceeding is relevant to an issue in a different segment of the proceeding, an authorized applicant may place such information on the record of the subsequent segment as authorized by the APO.").

61.   On information and belief, the Firm abused the Predecessor APO by using ARC's and others' BPI as a springboard for the Current Investigations. The Firm added nine attorneys and non-attorneys to the Predecessor APO *after* the Commission had already issued its determinations in the Predecessor Investigations.

62.     On information and belief, the Firm's post-determinations use of the BPI was to advance the Current Investigations, not the Predecessor Investigations. In their letter, therefore, ARC and ASF-K urged the Department to rescind the Firm's authorization to receive BPI in the Current Investigations under the APO.

63.     The Department has issued a questionnaire to ASF-K.   Section A of the questionnaire response is currently due on November 21, 2022. Under modifications of the Department's regulations as a result of COVID-19, parties are no longer required to serve copies of materials containing BPI by hand or mail delivery to parties on the APO service list, pursuant to 19 C.F.R. § 351.303(f)(1). Instead, the Department now deems service to be effectuated upon filing of the submission in ACCESS (the Department's secure electronic filing system), and parties on the APO list can electronically download the BPI filing upon the Department's posting of the document in ACCESS. *Temporary Rule Modifying AD/CVD Service Requirements Due to COVID-19*, 85 Fed. Reg. 17,006 (Mar. 26, 2020) (codified at 19 C.F.R. § 351.303(f)(4)). That means that within approximately one day after ASF-K submits the APO version of response to Section A of the Department's questionnaire, persons in the Firm that are on the Department's list of authorized APO recipients will be able to access ARC's and ASF-K's BPI.

**The Department's Response To The Misconduct Allegations**

64.     On October 18, 2022, the Department informed Plaintiffs, via a letter from Ms. Bagnal, that the Department would not make a determination as to whether the Firm should be disqualified from further participation in the Current Investigations.

65.     Specifically, ignoring its own prior administrative precedent, the Department stated that its decision is premised on its position that 19 C.F.R. § 351.313 is not "intended to cover ethical conflicts uniquely within the province of local Bar authorities."

66.     Moreover, the Department informed Plaintiffs in its letter that it will not (a) timely rescind the Firm's access to Plaintiffs' BPI in the Current Investigations; or (b) timely terminate the Current Investigations under the Department's sanctions authority and/or dismiss the underlying antidumping and countervailing duty petitions. Instead, the Department informed Plaintiffs that "we have referred [Plaintiffs' allegations regarding potential APO violations] to the director of the APO unit."

67.     The Department provided no indication that an investigation to determine whether an APO violation occurred has been initiated, let alone a timeline for when such an investigation will be completed.

## VI.     Statement of Claims

### Count One—Violation of the Administrative Procedure Act
### (Arbitrary and Capricious Refusal to Disqualify)

68.     The preceding paragraphs are incorporated herein by reference.

69.     The APA authorizes the Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

70.     The Attorney betrayed ARC. He did so for the cynical, self-interested purpose of trying to "undo" the Commission's negative injury determination in the Predecessor Investigations by including Mexico in the Current Investigations.

71.     Plaintiffs requested that the Department disqualify the Attorney, the Accountant, and the Firm from further participation as counsel in the Current Investigations due to ethical and APO violations, but the Department denied that request on the basis that it has no authority to adjudicate ethical violations and refused to even investigate the alleged APO violation.

72.     The Department's decision refusing to disqualify the Attorney, the Accountant, and the Firm is final agency action. It marks the consummation of the Department's decision-making process regarding whether the Attorney, the Accountant, and the Firm may participate in the Current Investigations, and it affects legal rights and obligations by giving the Firm the right to participate in the Current Investigations. Plaintiffs have no other adequate remedy available except for the Court to direct the disqualification of the Attorney, the Accountant, and the Firm in the Current Investigations.

73.     The Department's decision refusing to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Current Investigations is arbitrary, capricious, an abuse of discretion, and contrary to law, including because the Department failed to reasonably explain its decision.

74.     "State ethics rules provide an important backdrop for the federal agency rules regulating lawyers who appear and practice before the agencies." George M. Cohen, *The Laws of Agency Lawyering*, 84 Fordham L. Rev. 1963, 1972 (2016). Indeed, "lawyers who practice before federal agencies must comply with state ethics rules, typically based on the ABA Model Rules and

applicable to all lawyers, as well as with the specific rules applicable to lawyers engaged in agency practice." *Id.*

75.     In accordance with its authority under 19 C.F.R. § 351.313, the Department has applied the ABA Model Rules, including Rule 1.9, to evaluate whether a lawyer or law firm should be disqualified from practicing.

76.     The Attorney's and the Accountant's continued representation of the Coalition in the Current Investigations is contrary to Rule 1.9(a) of the ABA Model Rules and its analogue, Rule 1.9(a) of the District of Columbia Rules of Professional Conduct. In addition, even "before the Rules of Professional Conduct were adopted, the common law recognized that a lawyer could not undertake representation adverse to a former client in a matter substantially related to that in which the lawyer previously had served the client." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 584 (D.C. 2015) (internal quotation marks omitted).

77.     The Firm's representation of the Coalition in the Current Investigations is contrary to Rule 1.10(a) of the ABA Model Rules and its analogue, Rule 1.10(b)(1) of the District of Columbia Rules of Professional Conduct: "[W]hen a lawyer becomes associated with a firm, the firm may not knowingly represent a person in a matter which is the same as, or substantially related to, a matter with respect to which the lawyer had previously represented a client whose interests are materially adverse to that person and about whom the lawyer has in fact acquired information protected by Rule 1.6 that is material to the matter."

78.     ARC faces immediate irreparable harm by virtue of the ongoing conflict of interest. Where, as here, former clients "have already shared much inside information with" former counsel, the former clients' "fear of unfair advantage if their adversary … is at liberty to avail itself of [former counsel's] accumulated knowledge" means "it cannot be said with certainty that any taking

of unfair advantage could be remedied *ex post facto.*" *Makita*, 17 C.I.T. at 250. The former clients, therefore, "are confronted with the threat of irreparable harm." *Id.*

79.     The danger here is not limited to the Firm overtly using confidences in the Current Investigations. There is also a risk that the Firm, while not explicitly using confidences, may use such confidences to shape its prosecution of the Current Investigations, including guiding what lines of attack to pursue and what lines to abandon.

80.     ASF-K shares in this immediate irreparable harm to the extent the Firm's exploitation of ARC's confidential information can also be used against ASF-K in the Current Investigations.

81.     The Department has asserted that it will not "address the ethical questions raised by Amsted's filings at this time."

82.     The Department's decision not to act in the face of these serious allegations was the antithesis of reasoned decision-making.

83.     Accordingly, the Court should set aside the Department's refusal to disqualify the Attorney, the Accountant, and the Firm in the Current Investigations; order the Department to disqualify the Attorney, the Accountant, and the Firm in the Current Investigations; and direct the Department to dismiss, without prejudice to refiling, the petition filed by the Firm in the Current Investigations.

### Count Two—Violation of the Administrative Procedure Act
### (Arbitrary and Capricious Failure to Timely Rescind Access to BPI)

84.     The preceding paragraphs are incorporated herein by reference.

85.     The APA authorizes the Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

86.     Plaintiffs requested that the Department rescind the Firm's authorization to access Plaintiffs' highly-sensitive BPI, which Plaintiffs will provide in response to Department questionnaires. The Department, however, refused to timely rescind access to Plaintiffs' BPI in the Current Investigations.

87.     Instead, the Department informed Plaintiffs that "we have referred [Plaintiffs' allegations regarding potential APO violations] to the director of the APO unit."  The Department provided no indication that an investigation to determine whether an APO violation occurred has been initiated, let alone a timeline for when such an investigation will be completed.

88.     The Department's decision not to timely rescind (or even to timely investigate whether it is appropriate to rescind) the Firm's authorization to access to Plaintiffs' BPI is final agency action affects legal rights and obligations by giving the Firm the indefinite right to Plaintiffs' confidential information and imposing a continuing duty on Plaintiffs to share it with the Firm. Plaintiffs have no other adequate remedy except for the Court to order the Department to rescind the Firm's access to Plaintiffs' BPI in the Current Investigations.

89.     The Department's decision not to timely rescind or timely investigate the Firm's authorization to access Plaintiffs' BPI is arbitrary, capricious, and an abuse of discretion. *See Hyundai Pipe*, 11 C.I.T. at 240.

90.     Accordingly, the Court should order the Department to rescind the Firm's authorization to access to Plaintiffs' BPI.

**Count Three—Violation of the Administrative Procedure Act**
**(Failure to Timely Rescind Access to BPI in Violation of Constitutional Due Process)**

91.     The preceding paragraphs are incorporated herein by reference.

92.     The APA authorizes the Court to hold unlawful and set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2).

93.     The Fifth Amendment of the U.S. Constitution requires that no person be deprived of their property without due process of law. *See* U.S. Const. amend. V, cl. 4; *Mathews v. Eldridge*, 424 U.S. 319, 332-36 (1976); *Young v. Dep't of Housing and Urban Dev.*, 706 F.3d 1372, 1376 (Fed. Cir. 2013).

94.     Procedural due process requires that certain substantive rights, such as a property interest, cannot be deprived unless constitutionally adequate procedures are followed.

95.     To assert a procedural due process claim, a plaintiff needs to show that there has been: (i) a deprivation of (ii) life, liberty, or property (iii) without due process of law. *Id*.

96.     "A company's confidential information … qualifies as property to which the company has a right of exclusive use." *United States v. O'Hagan*, 51 U.S. 642, 654 (1997); *see also Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential business information has long been recognized as property."); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04 (1984) (company had property right in the health, safety, and environmental data it submitted to agency).

97.      The Department's failure to timely rescind (or timely investigate whether it is appropriate to rescind) the Firm's authorization to access Plaintiffs' BPI amounts to a deprivation of Plaintiffs' property interest.

98.     Due process requires that the party being deprived of their property have a meaningful opportunity to be heard by the decision-maker, at a meaningful time, and in a meaningful manner. *Mathews*, 424 U.S. at 332-33. Notice and an opportunity to be heard are the essential requirements of due process. *Young*, 706 F.3d at 1376.

99.      By refusing to timely rescind the Firm's authorization to access Plaintiffs' BPI in the Current Investigations, the Department is adversely affecting Plaintiffs' legal rights and obligations by giving the Firm the indefinite right to Plaintiffs' confidential information and

imposing a continuing duty on Plaintiffs to share it with the Firm. Accordingly, the Department is violating Plaintiffs' procedural due process rights in violation of the Fifth Amendment.

100.    Therefore, the Court should order the Department to rescind the Firm's authorization to access Plaintiffs' BPI in the Current Investigations.

**Count Four—Mandamus**
**(Defendants Are Subject to Mandamus)**

101.    The preceding paragraphs are incorporated herein by reference.

102.    The Court has authority over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361; *see also* 28 U.S.C. § 2643(c)(1) .

103.    Courts issue writs of mandamus both to direct disqualification of counsel, *see In re Am. Airlines, Inc.*, 972 F.2d 605, 608-09 (5th Cir. 1992), and to reverse counsel's disqualification, *see In re Shared Memory Graphics LLC*, 659 F.3d 1336, 1339-40 (Fed. Cir. 2011).

104.    The Department and Secretary are clearly and indisputably required to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Current Investigations due to their ethical and Predecessor APO violations, which irrevocably taint the proceedings therein.

105.    Without another jurisdictional basis to challenge the Department's decision regarding disqualification, Plaintiffs will have no other adequate means of seeking relief. Plaintiffs will suffer irremediable damage if forced to wait to appeal. Any advantage the Coalition and its counsel possess as a result of counsel's representation of ARC could be put to use in the Current Investigations. Information once used or exposed would not be forgotten and could be used against ARC and other Plaintiffs. And the public perception of the profession could be damaged.

106.   Accordingly, the Court should issue an order compelling the Department and Secretary to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Current Investigations and ordering the Department and Secretary to dismiss, without prejudice to refiling, the petition filed by the Firm in the Current Investigations.

## VII.   Prayer For Relief

Wherefore, Plaintiffs pray that this Court will provide them relief from the Department's unlawful violation of the APA and Fifth Amendment of the U.S. Constitution by:

1.   Declaring the Department's refusal to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Current Investigations arbitrary, capricious, an abuse of discretion, and contrary to law;

2.   Directing the Department to disqualify the Attorney, the Accountant, and the Firm from representing the Coalition in the Current Investigations;

3.   Preliminarily and permanently enjoining the Department, its agencies, officers, employees, and agents, and others who are in active concert or participation with them, from allowing the Attorney, the Accountant, and the Firm any access to the Current Investigations at the Coalition's behest;

4.   Declaring the Department's failure to timely rescind the Firm's authorization to access Plaintiffs' BPI in the Current Investigations as arbitrary, capricious, an abuse of discretion, and a denial of due process;

5.   Preliminarily and permanently enjoining the Department, its agencies, officers, employees, and agents, and others who are in active concert or participation with them, from disclosing, or requiring Plaintiffs to disclose, to the Attorney, the Accountant, and the Firm in the Current Investigations BPI submitted by Plaintiffs;

6.    Directing the Department to dismiss, without prejudice to refiling, the petition filed in the Current Investigations; and

7.    Providing Plaintiffs such further and additional relief as may be just.

Dated: October 31, 2022                          Respectfully submitted,

                                                 /s/ Richard P. Ferrin
                                                 Douglas J. Heffner
                                                 Brian P. Perryman
                                                 Richard P. Ferrin
                                                 Carolyn Bethea Connolly
                                                 FAEGRE DRINKER
                                                 BIDDLE & REATH LLP
                                                 1500 K Street, NW, Suite 1100
                                                 Washington, DC 20005
                                                 (202) 230-5803

                                                 *Counsel for Plaintiffs*
                                                 *Amsted Rail Company, Inc. and*
                                                 *ASF-K de Mexico S. de R.L. de C.V.*

**Verification**

I, James Allan, LCB, declare as follows:

1.      I am the Director of Trade Compliance for Amsted Industries Incorporated, an affiliate of Amsted Rail Company, Inc. ("ARC"). I have held this position since November 2019. As the Director of Trade Compliance, I am responsible for, among other things, setting global policy for all ARC trade compliance activities and managing communications to and from government agencies. I am also a licensed U.S. Customs Broker.

2.      I have personal knowledge of ARC's activities and affairs as set forth in the foregoing Verified Complaint and, if called on to testify, I would competently testify as to those factual matters stated herein.

I verify under penalty of perjury that the foregoing is true and correct. Executed on October 31, 2022.

Jay Allan
Digitally signed by Jay Allan
Date: 2022.10.31 13:54:13
-07'00'

_____
James Allan, LCB

**Verification**

I, Douglas J. Heffner, declare as follows:

1.      I am a partner at Faegre Drinker Biddle & Reath LLP and counsel for Amsted Rail

Company, Inc. and ASF-K de Mexico S. de R.L. de C.V.

2.      I have personal knowledge of the docket and filings in the following antidumping

and countervailing duty investigations before the U.S. International Trade Commission and U.S.

Department of Commerce:

- *Certain Freight Rail Coupler Systems and Components from China*, DOC Inv. Nos. A-570-143, C-570-144; USITC Inv. Nos. 701-TA-670, 731-TA-1570; and

- *Certain Freight Rail Couplers and Parts Thereof from China and Mexico*, DOC Inv. Nos. A-570-145, A-201-857, C-570-146; USITC Inv. Nos. 701-TA-682, 731-TA-1593-1593

3.      If called on to testify, I would competently testify as to those factual matters stated

herein.

I verify under penalty of perjury that the foregoing is true and correct. Executed on October

31, 2022.

_____
Douglas J. Heffner